IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:13 cr 370 T 24 EAJ


UNITED STATES OF AMERICA


            Plaintiff,
v.                              July 16, 2014
                                2:30 p.m.

LAWRENCE H. DORMAN

            Defendant.
_____/



        TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE SUSAN C. BUCKLEW
    UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Government:     Natalie Adams
                        Assistant U.S. Attorney
                        U.S. Attorney's Office
                        400 North Tampa Street
                        Suite 3200
                        Tampa, FL 33602


For the Defendant:      Daniel Mario Hernandez
                        Law Office of Daniel M.
                        Hernandez
                        902 N Armenia Ave
                        Tampa, FL 33609

Reported By:          Sandra K. Provenzano, RPR
                      Official Court Reporter
                      U.S. District Court
                      801 North Florida Avenue
                      Tampa, FL 33602
                      (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

<u>INDEX</u>

<u>WITNESS:</u>                                          <u>PAGE:</u>

  IRIS A. DORMAN,                                 6
       DIRECT EXAMINATION                         7
  BY MR. HERNANDEZ
       CROSS-EXAMINATION                         20
  BY MS. ADAMS
       REDIRECT EXAMINATION                      37
  BY MR. HERNANDEZ

*****

<u>EXHIBITS:</u>                    <u>IDENTIFIED:</u>




<u>EXHIBITS:</u>              <u>RECEIVED:</u>

  No. 2                  30
  No. 3                  35
  Composite Exhibit 1    40

```
 1                    P R O C E E D I N G
 2              COURT SECURITY OFFICER:  All rise.  This          02:29
 3     Honorable Court is again in session.                      02:29
 4              THE COURT:  Thank you.                            02:29
 5              MR. HERNANDEZ:  My client hasn't arrived.         02:31
 6     Can I go down -- I don't know if she gets my messages     02:31
 7     because she probably doesn't have her phone with her.     02:31
 8              THE COURT:  That's probably why.  Just out        02:31
 9     of curiosity where are you going?                         02:31
10              MR. HERNANDEZ:  I was suggested maybe 13A.        02:31
11              THE COURT:  Yes, that's where I would go,         02:31
12     too.                                                      02:31
13                    (PAUSE IN PROCEEDING.)                      02:33
14              THE COURT:  You need a few minutes?               02:34
15              MR. HERNANDEZ:  Judge, I think we're ready.       02:34
16     I had given the Court some documents that I may be        02:34
17     referring to as an exhibit; however, my client just      02:34
18     handed me two other papers that I don't have copies for   02:34
19     is the only problem unless I can get copies.              02:34
20              THE COURT:  Susan, could you run outside and      02:34
21     get the copies.                                           02:34
22              COURTROOM DEPUTY:  Yes, Your Honor.               02:34
23              THE COURT:  Let me go ahead and call the          02:35
24     case the matter.  The matter that is set for hearing this 02:35
25     afternoon, it's actually an ancillary hearing.  And it    02:35
```

1   has to do with a forfeiture of real property located at   02:35

2   3127 Gardner Road in Lakeland Florida.   02:35

3         I do have in the motion the plat number and   02:35

4   that description but I just won't read that into the   02:35

5   record.   02:35

6         At sentencing I've forfeited all of --   02:35

7   Mr. Dorman, who is also present this morning -- this   02:35

8   afternoon -- Mr. Dorman's interest in that property.  So   02:35

9   the only issue I think we have today is what interest   02:35

10   Miss Dorman -- Iris Dorman, as I understand it, is   02:35

11   Lawrence Dorman's mother -- has in that piece of   02:35

12   property.   02:36

13         So with that said, Mr. Hernandez you need me   02:36

14   to wait a few minutes for you so I can get copies before   02:36

15   we start?   02:36

16         MR. HERNANDEZ:  Yes, ma'am.   02:36

17         THE COURT:  All right.   02:36

18           (PAUSE IN PROCEEDING.)   02:36

19         THE COURT:  Mr. Hernandez and Mr. Muench,   02:37

20   could I see you just a second at sidebar.  We're not on   02:37

21   the record.   02:37

22           (PAUSE IN PROCEEDING.)   02:40

23         MR. HERNANDEZ:  Judge, I believe that all   02:40

24   the documents that I was going to be questioning   02:40

25   Mrs. Dorman are attached to one clip as one composite   02:40

1    exhibit.  I didn't separate them, and I was simply going    02:40

2    to be asking her questions about some of these documents.    02:40

3              THE COURT:  Okay.  You have a copy, Miss    02:40

4    Adams?    02:40

5              MS. ADAMS:  I do, and no objection to their    02:40

6    admission at all.    02:40

7              THE COURT:  All right.  Then I'll let you    02:40

8    begin.    02:40

9              MR. HERNANDEZ:  Judge, at this time I would    02:40

10   call Iris Dorman to the stand.    02:40

11             THE COURT:  All right.  Miss Dorman, if    02:40

12   you'll come forward to be sworn, and then have a seat    02:40

13   over there in the witness chair.    02:40

14             THE WITNESS:  This chair right here, ma'am?    02:40

15             THE COURT:  Yes.  First you have to be    02:40

16   sworn.    02:41

17             COURTROOM DEPUTY:  Please raise your right

18   hand.

19             Do you solemnly swear or affirm that the

20   testimony you shall give in this cause shall be the

21   truth, the whole truth, and nothing but the truth, so

22   help you God?

23             THE WITNESS:  I do.

24                  IRIS A. DORMAN,

25   a witness, having been duly sworn to tell the truth, the

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1    whole truth and nothing but the truth, was examined and
2    testified as follows                                        02:41
3              COURTROOM DEPUTY:  Please state your name         02:41
4    and spell your last name for the record.                    02:41
5              THE WITNESS:  Iris A. Dorman, D-O-R-M-A-N.         02:41
6              COURTROOM DEPUTY:  Thank you.                      02:41
7                      DIRECT EXAMINATION                        02:41
8    BY MR. HERNANDEZ:                                           02:41
9    Q.    Good afternoon, ma'am.                                02:41
10         Are you the mother of Lawrence Dorman?                02:41
11   A.    I sure am, yes.                                       02:41
12   Q.    And is he the gentleman that's sitting in the        02:41
13   front row in the right hand -- my right hand of the        02:41
14   courtroom?                                                  02:41
15   A.    Yes, sir.  Yes, sir.                                  02:41
16   Q.    And have you claimed an ownership interest in the    02:41
17   real property located at 3127 Gardner Road in Lakeland,    02:41
18   Florida?                                                    02:41
19   A.    Yes, sir.                                             02:41
20   Q.    And, in fact, is it true that your -- you bought     02:41
21   the property yourself?                                      02:42
22   A.    Yes.                                                  02:42
23   Q.    Could you tell the Court the circumstances of       02:42
24   your buying the property?                                   02:42
25   A.    Circumstances -- can you clarify that better?        02:42
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Well, sure.  Did you buy it with your own funds?    02:42

2    A.    I bought it with funds that was returned to me    02:42

3    that I had lent out over a period of years.    02:42

4    Q.    Okay.  Be specific.  Tell the Court how -- the    02:42

5    money that was used to buy the property, where did that    02:42

6    money come from?    02:42

7    A.    It came from a settlement that my son had got,    02:42

8    and I was one of his debtors --    02:42

9         THE COURT:  No.  Just try to answer the    02:42

10   question.  Don't try to argue it.  Just try to answer the    02:42

11   question he's asked.    02:42

12        THE WITNESS:  Some funds from my son.    02:42

13        MR. HERNANDEZ:  Okay.    02:42

14        THE COURT:  From a settlement.  Go ahead.    02:42

15   You were starting to say.    02:42

16        THE WITNESS:  From a settlement he got from    02:42

17   a car accident.    02:43

18   BY MR. HERNANDEZ:    

19   Q.    Is that money that you received to -- from your    02:43

20   son, was that money that he owed you?    02:43

21   A.    Yes.    02:43

22   Q.    And was that -- is that the money that was used    02:43

23   to purchase the house?    02:43

24   A.    Yes, sir.    02:43

25   Q.    Did your son Lawrence Dorman provide any money of    02:43

| | | |
|---|---|---|
| 1 | his own to purchase that property? | 02:43 |
| 2 | A.    Absolutely not. | 02:43 |
| 3 | Q.    Now, your -- the deed has your name and your | 02:43 |
| 4 | son's name on it; correct? | 02:43 |
| 5 | A.    Yes, sir. | 02:43 |
| 6 | Q.    Can you tell the Court the circumstances of why | 02:43 |
| 7 | his name appears on the deed even though he didn't | 02:43 |
| 8 | contribute any money to it. | 02:43 |
| 9 | A.    Can I go lengthy with it and explain?  Or how | 02:43 |
| 10 | should I -- because it's a lengthy -- not lengthy, but | 02:43 |
| 11 | it's a story. | 02:43 |
| 12 | Q.    Go ahead and explain it.  And I'll interrupt | 02:43 |
| 13 | you if -- | 02:43 |
| 14 | A.    My son has medical issues that the Court's aware | 02:43 |
| 15 | of that he needed to have a stable place that he could | 02:43 |
| 16 | live.  And not -- so we could check on him. | 02:44 |
| 17 | Because he has a lot of problems.  And I as a | 02:44 |
| 18 | mother wanted to make sure that if something happened to | 02:44 |
| 19 | me, that my son would have a place to live, not as a | 02:44 |
| 20 | gift, but as a sole bearer of a house that would keep a | 02:44 |
| 21 | roof over his head because I have done it before.  I | 02:44 |
| 22 | thought that it would give him a sense of normalcy that | 02:44 |
| 23 | he could be normal like everybody else. | 02:44 |
| 24 | But he wasn't.  He still has some medical | 02:44 |
| 25 | problems.  But that's the only reason I put his name on | 02:44 |

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  the deed because I wanted to make sure that if something  02:44

2  happened to me that I have other children so my other  02:44

3  children wouldn't come in like in a will or trust and all  02:45

4  and try to take it saying it's part of my property so he  02:45

5  wouldn't have a place to live.  02:45

6          That's why I put him on it.  02:45

7  Q.      Now, first of all, you said you have done this  02:45

8  before.  Tell the Court about what you mean by that.  02:45

9  A.      It was actually ten acres of property, two  02:45

10  separate pieces of property in Polk County.  And about  02:45

11  probably 20 years ago my son, like I said, has problems.  02:45

12  And I had to go to Polk County zoning board and get them  02:45

13  to release a partial of my property to put him a mobile  02:45

14  home on.  02:45

15          And I had to go down there and fight the zoning  02:45

16  board about it because he has medical issues because they  02:45

17  only allow one dwelling per five-acre track.  02:45

18          And I went down and pled with them to let me put  02:45

19  a mobile home on my place so I could see about him and  02:46

20  make sure he was okay.  They did allow that.  They did  02:46

21  allow that.  I put a mobile home right next to me.  02:46

22          The address to that is 5080.  It's a small mobile  02:46

23  home.  He lived there for 15 years.  Also I deeded that  02:46

24  property over with my name and my son's name for -- for  02:46

25  homestead.  02:46

```
 1          So because if you already had a home in the State      02:46
 2     of Florida -- I don't know how it is anywhere else, but     02:46
 3     in the State of Florida if you already have a home, you     02:46
 4     can't homestead another one.  And the property that I       02:46
 5     gave him to put this mobile home on, he had -- I had to     02:46
 6     have his name on it so he could file homestead so the       02:46
 7     taxes could be paid on the partial that was cut out of my   02:46
 8     five acres.                                                 02:46
 9     Q.     So while you were living as you are living now --    02:46
10     A.     Yes.                                                 02:46
11     Q.     -- was it your intention that you would be           02:46
12     co-owners with anyone else or in your mind were you full    02:47
13     100 percent owner of the property at 3127 Gardner Road?     02:47
14     A.     Did I think I was going to have someone else as      02:47
15     an owner?                                                   02:47
16     Q.     As far as you knew, were you the sole owner of       02:47
17     the property?                                               02:47
18     A.     I knew his name was on it, but I didn't know the     02:47
19     repercussions of putting somebody else on your -- I don't  02:47
20     understand what you mean.                                   02:47
21     Q.     The fact that you did this, that putting his name    02:47
22     on the property, did you consider yourself a half owner     02:47
23     where you only had a half interest to the property?        02:47
24     A.     No, no.                                              02:47
25     Q.     Or did you consider yourself the owner of the       02:47
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   property?

2   A.      Survivor type.                                      02:47

3   Q.      Okay.  Now, your decision to do this to put his     02:47

4   name on it even though you did not consider him to be a     02:47

5   co-owner, was that based on legal advice that you had       02:47

6   received from a real estate attorney, or was it something   02:47

7   that you simply decided that this is what you thought        02:47

8   would be the best thing to do under the circumstances of     02:47

9   your son having the medical issues or the mental issues      02:48

10  that he had?                                                02:48

11  A.      No.  Actually a couple of real estate people that   02:48

12  I had talked to in the -- about it, had advised me to --    02:48

13  if I wanted my son to have this property at my death, had   02:48

14  told me that I needed to put him on as a survivorship.      02:48

15          And actually I didn't see where they had wrote it   02:48

16  "survivorship."  They just said provisions for that type    02:48

17  of situation because we're not married couple.              02:48

18          So he wouldn't actually get it --                   02:48

19  Q.      In addition to solely being the only person that    02:48

20  actually put money on the property, who has been paying     02:48

21  for the maintenance of the house such as lawn maintenance   02:48

22  and things of that nature?                                  02:48

23  A.      I have, and I believe you have all the receipts     02:48

24  of my lawn service.                                         02:48

25  Q.      In fact, I am going to show you --                  02:48

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | | |
|---|---|---|
| 1 | A.    I was doing it, but I can't do it anymore. | 02:48 |
| 2 | MR. HERNANDEZ:  Judge, may be the ELMO would | 02:48 |
| 3 | be the best -- | 02:48 |
| 4 | THE COURT:  Okay. | 02:49 |
| 5 | MR. HERNANDEZ:  -- the best way.  Is there a | 02:49 |
| 6 | way to make this a little clearer? | 02:49 |
| 7 | THE COURT:  Yes.  You can zoom in and zoom | 02:49 |
| 8 | out. | 02:49 |
| 9 | MR. HERNANDEZ:  There we go. | 02:49 |
| 10 | BY MR. HERNANDEZ: | 02:49 |
| 11 | Q.    This is one of the documents that has been | 02:49 |
| 12 | provided to the Court, and I believe that there are | 02:49 |
| 13 | multiple -- different ones for different months.  Can you | 02:49 |
| 14 | tell the Court what this is? | 02:49 |
| 15 | A.    That's a receipt when I pay for the lawn care. | 02:49 |
| 16 | That's the receipt that Mr. Victor Martin gives me, my | 02:49 |
| 17 | lawn service man, that goes there.  Because I can no | 02:49 |
| 18 | longer take the mower, and I had to find someone to take | 02:49 |
| 19 | care of the lawn because I like to do that because it | 02:49 |
| 20 | doesn't look like the house is abandoned.  And it has to | 02:50 |
| 21 | have the lawn cut and stuff done to it. | 02:50 |
| 22 | Q.    This is another invoice -- is this the same | 02:50 |
| 23 | thing? | 02:50 |
| 24 | A.    No.  Now that one right there is combined with my | 02:50 |
| 25 | yard and 3127 Gardner Road.  He combined it together for | 02:50 |

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | | |
|---|---|---|
| 1 | me to buy one bill. | 02:50 |
| 2 | Q.    That's why it's a higher amount? | 02:50 |
| 3 | A.    Yes. | 02:50 |
| 4 | Q.    Here's another one.  I believe there's several, | 02:50 |
| 5 | but let me show you a couple more. | 02:50 |
| 6 | A.    Yeah, that's Gardner. | 02:50 |
| 7 | Q.    And what about this one? | 02:50 |
| 8 | A.    That's Gardner, too. | 02:50 |
| 9 | Q.    Now, to your knowledge has anyone other than | 02:50 |
| 10 | yourself been paying these maintenance expenses? | 02:50 |
| 11 | A.    No.  Even when my son lived in the house, I still | 02:50 |
| 12 | mowed the yard. | 02:50 |
| 13 | Q.    Did you put your son's name solely for the | 02:50 |
| 14 | purpose of having a survivorship interest in the | 02:51 |
| 15 | property? | 02:51 |
| 16 | A.    That's the only reason. | 02:51 |
| 17 | Q.    To have a house to live in? | 02:51 |
| 18 | A.    To live in because he does have issues.  He can't | 02:51 |
| 19 | be moved everywhere. | 02:51 |
| 20 | Q.    Now, how far away is the Gardner residence to the | 02:51 |
| 21 | residence that you live in with your husband? | 02:51 |
| 22 | A.    A mile and a half. | 02:51 |
| 23 | Q.    Did that have something to do with it as far as | 02:51 |
| 24 | being close proximity so you could check on him? | 02:51 |
| 25 | A.    Yes.  He has seizures.  He has -- his right | 02:51 |

1    temple lobe is missing and he has seizures.  And I can't    02:51

2    drive a long way because I check on him every day, 2 or 3    02:51

3    times a day.    02:51

4    Q.    Has he paid for any expenses?    02:51

5    A.    No, not -- no.  And I haven't paid him either    02:51

6    because he lived there.    02:52

7    Q.    Are you asking the Court to not seek -- are you    02:52

8    asking the Court that the property not be forfeited    02:52

9    because you are claiming 100 percent interest in the    02:52

10   property?    02:52

11   A.    Yes, sir.    02:52

12          MR. HERNANDEZ:  That's all I have.  Thank    02:52

13   you, Judge.    02:52

14          THE COURT:  Could I just make sure that on    02:52

15   your same page, are you offering into evidence Exhibit 1,    02:52

16   the packet?  That Exhibit 1.    02:52

17          MR. HERNANDEZ:  Judge, I could.  I can have    02:52

18   her identify each one if that would be easier.    02:52

19          THE COURT:  That would be helpful, yes.    02:52

20   BY MR. HERNANDEZ:    02:52

21   Q.    I'm going to show you a series of documents that    02:52

22   have been provided to the Court and to the government.    02:52

23   They're all part of claimant's Exhibit Number 1.    02:52

24          What is that document?  It's titled special    02:52

25   warranty deed?    02:52

```
1    A.    It's a special warranty deed.  Not everybody gets      02:52
2    these special warranty deeds because most people that buy    02:53
3    homes usually are either husbands and wives or single        02:53
4    people that don't have to have a special warranty deed.      02:53
5    But this is a special warranty deed that I had made up       02:53
6    for my son to make sure he had the house if something        02:53
7    happened.                                                    02:53
8    Q.    I'm going to show you a document that is titled        02:53
9    "quit claim deed"?                                           02:53
10   A.    Okay.  Now, that's on the property right next          02:53
11   door to me.  The one I said that we moved him a mobile       02:53
12   home on so he could stay near us.  That's the paper, the     02:53
13   quit-claim deed on that where he signed that back over to    02:53
14   us.  That's what that is.  That's a quit-claim deed where    02:53
15   he signed it back to us because the mobile home was          02:53
16   already there.                                               02:53
17        We didn't have to worry about it being deeded in        02:53
18   his name anymore.                                            02:53
19             THE COURT:  This doesn't have anything to do       02:53
20   with the property --                                         02:53
21             THE WITNESS:  No.  That's just something I         02:53
22   had done before.                                             02:53
23             THE COURT:  I see.                                 02:53
24   Q.    Did you rely on that experience to guide you --        02:53
25   A.    Yes, sir.                                              02:54
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Q.      -- in making this process here?                    02:54

2  A.      Yes, sir.                                          02:54

3  Q.      What about these other documents that you have     02:54

4  provided?  It's a two-page document.  The first page says  02:54

5  subdivision pursuant to the homestead provision of the     02:54

6  comprehensive plan section --                              02:54

7  A.      No.  That's on the property next door to me.  You  02:54

8  can see my son's name is up there.                         02:54

9  Q.      I have already showed you the maintenance          02:54

10 invoices.  What about these tax documents?                 02:54

11 A.      That's the taxes I paid this year.  They were      02:54

12 like 900 and something dollars.  Kind of paid it late      02:54

13 because I didn't know what was going to go on.             02:54

14 Q.      What is this document?  I think there's a --       02:54

15 A.      I can't --                                         02:55

16 Q.      There's something superimposed on it, a bank       02:55

17 receipt superimposed on it?                                02:55

18 A.      That's the money that he got from his car          02:55

19 accident.                                                  02:55

20 Q.      Okay.  And again the money that he gave you that   02:55

21 you used to purchase the property, was it money that he    02:55

22 already owed you?                                          02:55

23 A.      Yes, I have -- yes.                                02:55

24 Q.      Okay.  In his recovery on this accident did he     02:55

25 gift you any money, or was it strictly money that he was   02:55

| | | |
|---|---|---|
| 1 | paying back that he owed? | 02:55 |
| 2 | A.     He owed me money.  He owed lots of people money | 02:55 |
| 3 | that he paid back. | 02:55 |
| 4 | Q.     This is, I believe, another tax bill? | 02:55 |
| 5 | A.     That might be the taxes that I paid -- yeah, | 02:55 |
| 6 | that's the taxes, the 1200 and some dollars, that's the | 02:55 |
| 7 | taxes I had to pay when I bought the home because the | 02:55 |
| 8 | taxes hadn't been paid on the house because it was a repo | 02:55 |
| 9 | house. | 02:56 |
| 10 | Q.     Now, these are the two documents I think you may | 02:56 |
| 11 | have handed to me -- wait a minute.  Let me show you | 02:56 |
| 12 | this.  This is a Polk County Tax Collector statement. | 02:56 |
| 13 | What is this? | 02:56 |
| 14 | A.     Okay.  That -- that was for the year 2012.  Paid | 02:56 |
| 15 | that one, too. | 02:56 |
| 16 | Q.     Have you paid them every year? | 02:56 |
| 17 | A.     Yes. | 02:56 |
| 18 | Q.     Has your son paid any of it? | 02:56 |
| 19 | A.     No. | 02:56 |
| 20 | Q.     And what is this document? | 02:56 |
| 21 | A.     That's the bank draft out of my checking account | 02:56 |
| 22 | for the $80,000 that I owed for the repo house, and it | 02:56 |
| 23 | was a bank transfer. | 02:56 |
| 24 | Q.     Does it have anything to do with this claim? | 02:56 |
| 25 | A.     Yes. | 02:56 |

1   Q.      How so?                                                    02:56

2   A.      That's the funds that I used to buy my house.             02:57

3           THE COURT:  Okay.  I'm confused.  You've                  02:57

4   lost me.  These are the funds that you used to buy the            02:57

5   property that's in your name and your son's name?                 02:57

6           THE WITNESS:  Yes.                                        02:57

7   BY MR. HERNANDEZ:                                                 02:57

8   Q.      Other than living in the house, has your son done         02:57

9   anything other than some repairs as far as the --                02:57

10  investing in the house?                                           02:57

11  A.      No money.  Only thing he did -- actually tell you         02:57

12  the truth, I never would have bought that repo house if          02:57

13  my son didn't know how to do that.  I wouldn't be able to        02:57

14  afford to do what he did in that house.                          02:57

15          MR. HERNANDEZ:  Thank you.  That's all.                   02:57

16          THE COURT:  Give me just a second, Miss                   02:57

17  Adams.  The deed on the property is titled "special              02:57

18  warranty deed" and it's issued to -- I'm not going to            02:57

19  read the whole thing, but to Iris Dorman, a married             02:58

20  woman, and Lawrence Dorman, a single man, joint tenants         02:58

21  with right of survivorship; is that correct?                     02:58

22          THE WITNESS:  Yes, ma'am.                                 02:58

23          THE COURT:  And it's dated May the 16th,                  02:58

24  2012.                                                             02:58

25          THE WITNESS:  Yes, ma'am.                                 02:58

| | |
|---|---|
| 1 | THE COURT: Okay. Thank you. Miss Adams. | 02:58 |
| 2 | CROSS-EXAMINATION | 02:58 |
| 3 | BY MS. ADAMS: | 02:58 |
| 4 | Q. Miss Dorman, you mentioned your son has had | 02:58 |
| 5 | trouble his whole life; is that right? | 02:58 |
| 6 | A. Yes, ma'am. | 02:58 |
| 7 | Q. He had difficulty learning? | 02:58 |
| 8 | A. Yes, ma'am. | 02:58 |
| 9 | Q. He only made it to about the 8th grade? | 02:58 |
| 10 | A. Yes, ma'am. | 02:58 |
| 11 | Q. And he had trouble with the law basically since | 02:58 |
| 12 | he was a teenager; is that right? | 02:59 |
| 13 | A. Yes. | 02:59 |
| 14 | Q. Starting at 18? | 02:59 |
| 15 | A. Yes. | 02:59 |
| 16 | Q. And, you know, when he was 23 alone, looks like | 02:59 |
| 17 | he had arson, grand theft, criminal mischief, domestic | 02:59 |
| 18 | violence, stalking, battery, burglary. All in the one | 02:59 |
| 19 | year. Does that sound about right? | 02:59 |
| 20 | A. Uh-huh. | 02:59 |
| 21 | Q. Of course, you know he's been involved in various | 02:59 |
| 22 | drugs? | 02:59 |
| 23 | A. Uh-huh. | 02:59 |
| 24 | Q. I'm sorry? | 02:59 |
| 25 | A. Yes. | 02:59 |

BY MS. ADAMS:

Q.     Back in February of 2009 you got a non expiring
protection order against your son; is that right?

A.     Yes.  I'd like to explain that, too.

THE COURT:  I'm sorry, say that again so I
could hear the answer.

THE WITNESS:  Yes.

BY MS. ADAMS:

Q.     Notwithstanding that you have gone out of your
way to do everything you could to protect your son?

A.     Yes.

Q.     Protect him from himself even?

A.     Yes.

Q.     In fact, in his criminal case in this Court it
was your husband who paid for his criminal attorney?

A.     Absolutely.

Q.     In fact, that was quite expensive, wasn't it?

A.     Sure was.

Q.     Now, in 2010 was when your son got in a car
accident; right?

A.     Uh-huh.

Q.     In 2011, December 2011, is when he got that big
set for about $278,000?

A.     Yes, ma'am.

Q.     You took $150,000 of that from him; is that

```
 1   right?
 2   A.      Actually was 165.                                03:00
 3   Q.      You took 165,000 from him.  And that was just    03:00
 4   money that you could do whatever you want with, right,   03:00
 5   because he owed it to you?                                03:00
 6   A.      Uh-huh.                                          03:00
 7   Q.      All right.  And did he not give you the remainder 03:00
 8   of the money?                                            03:00
 9   A.      No.  He spent it.  He bought a boat and he bought 03:00
10   quite a few things.                                      03:00
11   Q.      He did not tell you the money he was giving you  03:00
12   was specifically to buy him a house?                     03:00
13   A.      No, no, no, no, no, no.                          03:00
14   Q.      I'd like to refer to one of the documents that   03:01
15   your attorney just showed you.                           03:01
16           You said this was a -- are you able to see that? 03:01
17   A.      Yes.                                             03:01
18   Q.      You said that this was the check that he gave you 03:01
19   for his settlement?                                      03:01
20   A.      Yes, he did.                                     03:01
21   Q.      And so that said Lawrence Dorman up there at the 03:01
22   top.  That's your son?                                   03:01
23   A.      Yes.                                             03:01
24   Q.      And this is to you, Iris Dorman?                 03:01
25   A.      Yes.                                             03:01
```

1    Q.    House payment?                                    03:01

2    A.    Uh-huh.                                           03:01

3    Q.    $278,853?                                         03:01

4    A.    Uh-huh.                                           03:01

5    Q.    But he just gave you $165,000 to do whatever you  03:01

6    wanted with it?                                         03:01

7    A.    No.  As far as verbal, yes.                       03:01

8              THE COURT:  I'm sorry?  As far as what?       03:01

9              THE WITNESS:  Verbal, telling me I could      03:01

10   have my money out of that money.                        03:01

11   Q.    So on paper he gave you all of it and said it was 03:01

12   for a house payment?                                    03:01

13   A.    Uh-huh.                                           03:01

14   Q.    But verbally he told you get to keep $165,000?    03:01

15   A.    Uh-huh.                                           03:02

16   Q.    You just happened to use it for a house payment?  03:02

17   A.    Yes.                                              03:02

18   Q.    You bought 3127 Gardner Road about six months     03:02

19   after he received his settlement check.  Does that sound 03:02

20   about right?                                            03:02

21   A.    Yeah.  It took awhile to find the house because a 03:02

22   lot of them I looked at was tore up too bad.            03:02

23   Q.    You don't dispute that he lived in the house?     03:02

24   A.    No, I don't dispute it.                           03:02

25   Q.    You don't dispute that he had possession and      03:02

```
1   control over the house?                                    03:02

2   A.      Not full control.  But he had possession, yes.    03:02

3   Because I was in and out all of the time.                 03:02

4   Q.      But you didn't live there?                        03:02

5   A.      No.                                               03:02

6   Q.      I'd like to play an audio tape for you and see if 03:02

7   you can recognize it.                                     03:02

8           (Audio tape playing).                             03:02

9           "..sell that house.                               03:02

10          I do, too.

11          Give your daddy back his money, take the rest and 03:03

12   do what you got to do.                                    03:03

13          I want to buy that house.  You got to sell it.    03:03

14   Get Buddy over to look at it, see how much it costs -- I  03:03

15   mean, see how much it's worth.  And put it on the market  03:03

16   and sell it.  All that junk has got to be cleaned up.     03:03

17          Yeah.                                             03:03

18          And that shed needs to be finished.               03:03

19          Yep.                                              03:03

20          I done cleaned all that back porch and all that   03:03

21   crap.

22          I'll be out the end of the month.                 03:03

23          We got to have that money back.                   03:03

24          I understand, mama.  I understand perfectly.  I   03:03

25   don't blame you one bit.  I say sell that fucking place   03:03
```

1    and let me move and get the hell out of there.  I want                03:03

2    to sell it.                                                            03:03

3            You need to sell it, and you also need to do and              03:03

4    I have told you and told you need to quit picking up the              03:03

5    trash that you pick up.                                                03:03

6            I know -- you are absolutely right.                           03:03

7            The trash that you hang with.  That damned ol'

8    girl that you had in there, she ain't nothing but a

9    fucking meth head, and how I do believe you knew she was.             03:04

10   You were doing meth with her.  And you are going to have              03:04

11   to stop that.  You are going to have to change your life,             03:04

12   son."                                                                 03:04

13   Q.    Is this you speaking to your son on a jail call?                03:04

14   A.    Sure was, yes.                                                  03:04

15   Q.    At this time I'd like to enter into evidence                    03:04

16   Government's Exhibit 1, this call?                                     03:04

17              MR. HERNANDEZ:  No objection.                              03:04

18              THE COURT:  Receive in evidence Government's               03:04

19   Exhibit 1.                                                            03:04

20              THE WITNESS:  Can I reply to that?                         03:04

21   Q.    I got some specific questions I've got for you.                 03:04

22   On that call you said he should sell the house?                       03:04

23   A.    Uh-huh.                                                         03:04

24   Q.    You said he should take the money from the house               03:04

25   and pay his daddy back; is that right?                                03:04

1    A.    Yeah.  He owes us money again.                   03:04

2    Q.    From the attorney?                               03:04

3    A.    Yeah, pretty much.  And other things but --      03:04

4    Q.    And you said he could do whatever he wants with  03:04

5    the rest of money, right?  You said that?             03:04

6    A.    Uh-huh.                                          03:04

7    Q.    Is that right?                                   03:04

8    A.    Yes.                                             03:04

9    Q.    And he certainly couldn't pay you back money he  03:04

10   owed you by selling a house that you own and giving you 03:04

11   back your own money; right?                           03:05

12   A.    Ah, not if you let me explain.                   03:05

13   Q.    Feel free.                                       03:05

14   A.    The house is worth more now since we fixed it and 03:05

15   repaired it.  And we could get quite a bit more money for 03:05

16   the house now, or I could.                            03:05

17         And if there's any money extra that when I sold  03:05

18   that house, he could have, and go on about his way.  But 03:05

19   he has to give me all -- he's in debt with me again,  03:05

20   again.                                                03:05

21   Q.    You said to this Court that you have a hundred   03:05

22   percent interest in that house.  Is that what you said? 03:05

23   A.    I do have a hundred percent interest in that     03:05

24   house.                                                03:05

25   Q.    If it was your house, he wouldn't be entitled to 03:05

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | | |
|---|---|---|
| 1 | pay you back using money from your house? | 03:05 |
| 2 | A.    The thing about it is, I have always helped him. | 03:05 |
| 3 | Q.    All right.  You said to your attorney that you | 03:05 |
| 4 | put the house in his name so that he could keep the house | 03:05 |
| 5 | after you died; is that right? | 03:05 |
| 6 | A.    Yes. | 03:06 |
| 7 | Q.    So that's a long term thing.  You are keeping | 03:06 |
| 8 | that house forever? | 03:06 |
| 9 | A.    Not really.  Because you don't ever know.  I | 03:06 |
| 10 | might get run over by a truck, fall and break my neck.  I | 03:06 |
| 11 | already fell and broke my back.  You don't know what's | 03:06 |
| 12 | going to happen. | 03:06 |
| 13 | Q.    But your plan was to put it in his name so he | 03:06 |
| 14 | could keep it and he could take it when you died? | 03:06 |
| 15 | A.    Yes. | 03:06 |
| 16 | Q.    That is the reason, I believe you said, the only | 03:06 |
| 17 | reason that you put that house in his name? | 03:06 |
| 18 | A.    I did put his name on that house, yes. | 03:06 |
| 19 | Q.    That's right?  I'd like to play a second tape for | 03:06 |
| 20 | you. | 03:06 |
| 21 |                    (Audio tape playing). | 03:06 |
| 22 |       "I took that truck to him but he gave me some | 03:06 |
| 23 | information I'm not very, very happy about. | 03:06 |
| 24 |       What? | 03:06 |
| 25 |       They're going to try to take your house. | 03:06 |

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1        Huh?

2        They're going to try to take your house.

3        Even with you on it?

4        Well, he said what they probably done is pulled

5   up the homestead where you have it homesteaded in your

6   name.  And they're not aware of my name being first on

7   the deed.  But I got a letter in the mail today from a

8   real estate agent saying that a foreclosure -- forfeiture

9   from the United States has been filed in Bartow on 3721

10  -- I'm so upset.  3127 Gardner Road.

11       And if there's any money owed on it, she could

12  help us get out the money owed on it.  I called that

13  lawyer back.  Your dad's gone now to Staples to fax that

14  letter to him.  It's even got a case number on there.

15  And he said there's -- there's absolutely no way that

16  they could take that house with you the first owner on

17  that house.

18       I said, well, that's what they seem like they're

19  going to try to do?

20       The lawyer said that?

21       No.  I said that?  That's that they're going to

22  try to do.

23       Who said they couldn't do that?

24       The lawyer said that.

25       My lawyer?

1       Yes.  So what I'm going to do tomorrow just in       03:08

2   case that they (inaudible) out, I'm going to go over     03:08

3   there tomorrow and get all your tools and put them in    03:08

4   that stock trailer.  Everything that I know that would be 03:08

5   of valuable to you, and put them in that stock trailer.  03:08

6   And I'm going to bring it back over to the house and put  03:08

7   it underneath the (inaudible).  Because you got all kinds 03:08

8   of tools, all kind of shit in there.  So I'm going to get 03:08

9   it all out of there.                                      03:08

10      Why did the lawyer say they couldn't do that?        03:08

11      Because my name is on it.  It's my fucking house.    03:08

12  I said we bought it.  We bought it and when we bought it  03:08

13  I couldn't leave it just in my name because the real     03:08

14  estate agent told me I couldn't file homestead.  So he   03:08

15  recommended me putting my son on it which would be Iris   03:08

16  A. Dorman and Lawrence Dorman.  So he could homestead it. 03:08

17  The plan was to buy the house, fix it up, him live in it, 03:08

18  and we sell it when the market goes up.  I didn't say     03:08

19  anything to him about money.  I said, that's my goddamn   03:09

20  house.  How in the hell are they taking it?  We'll give   03:09

21  them another call.  I'll bring it up to (inaudible).  He  03:09

22  said they can't do that.                                  03:09

23      If he said that, then I believe him.                 03:09

24      It's been filed on August the 2nd.  What they did    03:09

25  they filed it without notifying -- they notified you by  03:09

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    the letter today.  That letter today.  They are supposed                03:09

2    to also notify me that they're doing that.  Well, they                   03:09

3    haven't noticed that my name is on it too yet.  They only                03:09

4    looked at the homestead.  It's like a forfeiture if you                  03:09

5    don't try to head it off.  Once they see that, they can't               03:09

6    do nothing.  The motherfuckers.                                          03:09

7            I know and I ain't done a fucking thing.                         03:09

8            Motherfucking son of a bitches.  I hate the                      03:09

9    government.  I hate the Sheriff's Department.  I hate                     03:09

10   them all."                                                               03:09

11           (Conclusion of audio)                                            03:10

12   BY MS. ADAMS:                                                            03:10

13   Q.    Ms. Dorman, is that you speaking to your son in                    03:10

14   the jail?                                                                03:10

15   A.    Yes, it was.                                                       03:10

16   Q.    At this time I'd like to offer into evidence                       03:10

17   Government's Exhibit 2, that call?                                       03:10

18           THE COURT:  Receive in evidence 2.                               03:10

19           (EXHIBIT No. 2 ADMITTED INTO EVIDENCE.)                          03:10

20   Q.    What is it that you are reading on the stand?                      03:10

21   A.    Notes that I have made to myself.                                  03:10

22   Q.    Notes how to testify?                                              03:10

23   A.    Oh, no.  Just things I need to remember.                           03:10

24   Q.    For your testimony today?                                          03:10

25   A.    Uh-huh.                                                            03:10

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.    Just to get back to the call, several times you
say they're going to take your house.  You refer to it as
his house; is that right?

A.    Uh-huh.

Q.    Miss Dorman?

A.    Yes.  I said yes.  He's living there.

Q.    And this is just after you found out that the
government is seeking to forfeit the house; is that
right?

A.    I don't know when it was.  I don't remember that.

Q.    Okay.  On this call you give a long explanation
of why the deed is in your son's name?

A.    Uh-huh.

Q.    And your name?

A.    Uh-huh.

Q.    And that explanation says nothing about what's
about to happen when you die, that it's to provide for
him when you die.  You didn't say anything about that on
that call, did you?

A.    Not that call, but --

Q.    In fact you said you put it in his name because
you already had a homestead in your name; right?

A.    Uh-huh.

Q.    And you wanted investment property to fix up and
sell, and you weren't entitled to a homestead on it.  So

```
1   you put it in his name to get a homestead you weren't      03:11
2   entitled to.  That's what you said on the call, isn't it?  03:11
3   A.     Yes, it is.                                         03:11
4   Q.     You said it was your plan -- your and your son's    03:11
5   plan to go ahead and -- to go ahead and fix up the house.  03:11
6   That was the plan all along; right?                        03:11
7   A.     Uh-huh.                                             03:11
8   Q.     So if it was your plan with your son all along,     03:11
9   you don't need to tell him; he already knows.  Right?      03:12
10  A.     Uh-huh.                                             03:12
11  Q.     Now, on the call you also say I didn't say          03:12
12  anything to them about the money.  You said that?          03:12
13  A.     I didn't talk to my lawyer about it.  We didn't     03:12
14  have time.  We didn't know what was going on.              03:12
15  Q.     On the call when you say I didn't say anything to   03:12
16  them about the money, it wasn't I didn't hide from them    03:12
17  that this was purchased with your money, son?  That's not  03:12
18  what you meant?                                            03:12
19  A.     No, I don't think so.                               03:12
20  Q.     So at some point, you tell your son stop            03:12
21  referring to that as your house; right?                    03:12
22  A.     Uh-huh.                                             03:12
23  Q.     Because that looks bad for your forfeiture claim;   03:12
24  right?                                                     03:12
25  A.     Not really because people can rent homes and        03:12
```

1    invite people over and say, come to my home and it's not          03:12
2    their home; it belongs to the landlord.                           03:12
3    Q.    You can tell them don't you dare say that's in              03:12
4    your name?                                                        03:12
5    A.    No, I don't remember saying it.  No.                       03:12
6    Q.    So you also warn your son not to tell his lawyer           03:13
7    a different story about the two names on the deed than            03:13
8    the homestead story; right?                                       03:13
9    A.    Plain and simple.  It's in black and white.  It            03:13
10   says survivorship.  There's nothing wrote up saying              03:13
11   anything about homestead.  That's by mouth, not written.         03:13
12   Q.    And you tell your son don't tell anybody any               03:13
13   different than the homestead plan?                                03:13
14   A.    No, I haven't said anything like that.  I'd               03:13
15   remember.                                                         03:13
16         MS. ADAMS:  I'd like to play a third audio                  03:13
17   tape for you.                                                     03:13
18                   (Audiotape playing)
19         "Well, how do you know they can't mess with                03:13
20   the house?                                                        03:13
21         Because of the law books here.                             03:13
22         Don't talk too much about --                               03:13
23         In the law books state you got a lien                      03:13
24   against it, they can't touch it.  When the lawyer takes          03:13
25   me to court this month, when he takes me to court, they          03:13

only got 41 days to charge me and they haven't charged me    03:13

with nothing yet.  Forty-one days when I go in front of    03:13

the judge, they don't charge me --    03:14

       Being a lien against it, I'm first owner of    03:14

that house.    03:14

       You are the lienholder.    03:14

       It don't show lien though.  It shows me the    03:14

first owner.    03:14

       What do you mean?    03:14

       I don't have a lien on the house.

       Why didn't you put a lien on the house?    03:14

       Huh?    03:14

       Why didn't you put a lien on the house?    03:14

       I didn't have to put a lien on it.  The    03:14

lien -- the lien -- signed out as a deed is Iris Dorman    03:14

and Lawrence Dorman.  The reason I did that -- I was    03:14

going to get it just in my name, and the reason I did    03:14

that is because I couldn't file homestead.

       Well, if your name's on my deed, they can't

touch my house.

       Don't say "my."  Because I couldn't put    03:14

it -- I couldn't put a homestead on it.  I had to put    03:14

your name on it.  That's what I told your lawyer.    03:14

       What did my lawyer say?  He said he don't    03:14

think they can mess with it, but they're locking    03:14

1   everything down.  I told him, I said the reason his name        03:15

2   is on that is because I could not file a homestead and my       03:15

3   name already had one.  I had to put him on there for him        03:15

4   to file a homestead so the taxes wouldn't be high.              03:15

5   That's the reason the house was bought, for him to live         03:15

6   in it, fix it up and sell it and make money on it.  But         03:15

7   you don't tell him no different."                               03:15

8   BY MS. ADAMS:

9   Q.    So is that you're talking to your son in jail?            03:15

10  A.    Yes, it was.                                              03:15

11  Q.    At this time I'd like to offer into evidence             03:15

12  Government's Exhibit 3.                                          03:15

13        MR. HERNANDEZ:  No objection.                             03:15

14        THE COURT:  Receive into evidence                         03:15

15  Government's Exhibit 3.                                          03:15

16        (EXHIBIT No. 3 ADMITTED INTO EVIDENCE.)                   03:15

17  BY MS. ADAMS:                                                   03:15

18  Q.    So first in that call your son suggests he owns           03:15

19  the house, and he believes that you had just put a lien         03:15

20  on it.  Is that right?  Is that what he said?                   03:15

21  A.    That's what he said.                                      03:15

22  Q.    And then he says something about your name being          03:15

23  on his deed; right?                                             03:15

24  A.    Yeah, but you remember any son is not right.              03:15

25  Q.    And you say, in fact, you tell him, don't say             03:16

1    mine, don't say my deed?  Right?                          03:16

2    A.     He's also been read (phonetic) all his life.      03:16

3    Q.     Is that what you said?                             03:16

4    A.     Yeah.                                              03:16

5    Q.     You explained to him again what you told the       03:16

6    lawyer about the homesteading plan.  You explained it     03:16

7    again?                                                   03:16

8    A.     Uh-huh.                                            03:16

9    Q.     You tell him you don't tell him no different?      03:16

10   A.     He don't need to be talking for himself.  He       03:16

11   needs to just chill.                                      03:16

12   Q.     So you did tell him don't tell him any different?  03:16

13   A.     If it said I did, I did.                           03:16

14   Q.     I noticed you were reading some notes again        03:16

15   during that audiotape; is that right?                     03:16

16   A.     Uh-huh.                                            03:16

17   Q.     We'd like to ask the Court to direct the witness   03:16

18   to turn over her notes for review.                        03:16

19            THE COURT:  Okay.  That's fine.                  03:16

20            THE WITNESS:  Do you want them come get          03:16

21   them?                                                     03:16

22            THE COURT:  May we see what you're reading       03:16

23   from.                                                     03:16

24            THE WITNESS:  You want them?                     03:16

25            MS. ADAMS:  Sure.                                03:16

| | | |
|---|---|---|
| 1 | THE WITNESS:  You probably need me to read | 03:17 |
| 2 | them any way. | 03:17 |
| 3 | MS. ADAMS:  I don't have any more questions | 03:17 |
| 4 | for this witness at this time, but I'd like to reserve | 03:17 |
| 5 | the right to ask her a few more questions after any | 03:17 |
| 6 | argument by Mr. Hernandez, if these notes -- | 03:17 |
| 7 | THE COURT:  Mr. Hernandez, do you have any | 03:17 |
| 8 | questions? | 03:17 |
| 9 | MR. HERNANDEZ:  I have a few questions on | 03:17 |
| 10 | redirect. | 03:17 |
| 11 | THE COURT:  Okay.  Why don't you go ahead | 03:17 |
| 12 | and ask her questions and then when he gets through, if | 03:17 |
| 13 | you have any questions you can ask. | 03:17 |
| 14 | MS. ADAMS:  Thank you. | 03:17 |
| 15 | <u>REDIRECT EXAMINATION</u> | 03:17 |
| 16 | BY MR. HERNANDEZ: | 03:17 |
| 17 | Q.    Mrs. Dorman, in these conversations that have | 03:17 |
| 18 | just been played, there may have been at least one | 03:17 |
| 19 | occasion where Mr. Dorman refers to it as his house.  Was | 03:17 |
| 20 | Mr. Dorman living in that house? | 03:17 |
| 21 | A.    Anywhere you live, yes.  Anywhere you live it's | 03:17 |
| 22 | your house.  You live there.  You rent it.  You live | 03:17 |
| 23 | there.  If you live with your mother-in-law, it's your | 03:17 |
| 24 | house.  I mean, if you invite people over, it's your | 03:17 |
| 25 | house.  I don't understand. | 03:17 |

1    Q.    So when he said that to you, were you believing      03:17

2    it that he was claiming an ownership interest, or that he   03:18

3    simply referred to it as his house because that's where    03:18

4    he lived?                                                   03:18

5    A.    It's his home where he lives.  His stuff was        03:18

6    there.  His clothes was there.                             03:18

7    Q.    On more than one occasion you emphasize in those    03:18

8    calls that this was your house.  In fact, I believe you    03:18

9    say at one time this is my F'ing house; correct?          03:18

10   A.    Yes, I did.                                         03:18

11   Q.    When you told him, I believe, on one occasion,      03:18

12   don't -- something to the effect of don't refer to it as  03:18

13   your house, were you correcting him?                      03:18

14   A.    Yes, I was.  He has to be corrected.                03:18

15   Q.    When you were discussing your legal position and    03:18

16   the issue of forfeiture, were you in any way trying to    03:18

17   get him to -- to give a different version other than the  03:18

18   truth?                                                    03:19

19   A.    No.                                                 03:19

20   Q.    And when you were explaining these to him, were     03:19

21   you aware that he does not have a good sense of           03:19

22   comprehension?                                            03:19

23   A.    Yes, since he was seven years old.                  03:19

24         MR. HERNANDEZ:  That's all I have, Your             03:19

25   Honor.  Thank you.                                        03:19

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | | |
|---|---|---|
| 1 | THE COURT: All right. | 03:19 |
| 2 | MR. HERNANDEZ: Oh, I do have a question. | 03:19 |
| 3 | Q. These notes that have been provided to the | 03:19 |
| 4 | government, are these notes that you made yourself? | 03:19 |
| 5 | A. Yes. | 03:19 |
| 6 | Q. Were they notes to -- that you made yourself | 03:19 |
| 7 | after listening to the -- some of these conversations? | 03:19 |
| 8 | A. Yes. | 03:19 |
| 9 | Q. Was it for you to be able to somehow contrive | 03:19 |
| 10 | certain testimony or simply help you elaborate or explain | 03:19 |
| 11 | some of these statements that you might have made? | 03:19 |
| 12 | A. To help me explain and to make sense of the | 03:19 |
| 13 | conversations that was made. Just notes for myself. | 03:19 |
| 14 | Everybody makes notes. | 03:20 |
| 15 | Q. Sure. | 03:20 |
| 16 | MR. HERNANDEZ: That's all I have, Your | 03:20 |
| 17 | Honor? | 03:20 |
| 18 | THE COURT: Any questions? | 03:20 |
| 19 | MS. ADAMS: No, Your Honor. I don't have | 03:20 |
| 20 | any more questions. | 03:20 |
| 21 | THE WITNESS: They're funny, aren't they? I | 03:20 |
| 22 | told you you wouldn't be able to read my notes. | 03:20 |
| 23 | THE COURT: Could you give those back to | 03:20 |
| 24 | her? Thank you. | 03:20 |
| 25 | THE WITNESS: You thought it was something | |

1    bad, didn't you, girl?                                    03:20

2         MR. HERNANDEZ:  Other than I would move into         03:20

3    evidence Composite Exhibit 1 into evidence.  First I      03:20

4    would do that.                                            03:20

5         THE COURT:  I'll receive it into evidence.           03:20

6         (Composite Exhibit 1 ADMITTED INTO

7    EVIDENCE.)                                                03:20

8         MR. HERNANDEZ:  I do not have any other              03:20

9    witnesses, Your Honor.                                    03:20

10        THE COURT:  One thing I wasn't quite clear           03:20

11   on.  The property in question which was the property      03:20

12   that's located at 3127 Gardner Road in Lakeland, your son 03:20

13   homesteads that?                                          03:20

14        THE WITNESS:  Yes, ma'am.  And the reason            03:20

15   why his name is on it, I seen -- we went down to Bartow   03:20

16   to homestead it, and I have never really bought a home.   03:20

17   My husband bought a home, but I have not been in the      03:20

18   financial part of it before and know what to do.  And     03:21

19   they instructed me when I bought the house, it had to be  03:21

20   homesteaded in his name.  I put his name on there because 03:21

21   I couldn't homestead it.                                  03:21

22        THE COURT:  You homestead another piece of           03:21

23   property?                                                 03:21

24        THE WITNESS:  I have a house and ten acres           03:21

25   of property, yes, ma'am.                                  03:21

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Thank you.  I don't have any                03:21

2     other questions.  You may step down.  Thank you.            03:21

3          THE WITNESS:  Thank you, Your Honor.                    03:21

4          THE COURT:  Mr. Hernandez, do you have any              03:21

5     other witnesses?                                             03:21

6          MR. HERNANDEZ:  No, ma'am.                              03:21

7          THE COURT:  Miss Adams, do you have any                 03:21

8     witnesses?                                                   03:21

9          MS. ADAMS:  No, Your Honor.                             03:21

10         THE COURT:  Okay.  Mr. Hernandez, do you                03:21

11    have any argument?                                           03:21

12         MR. HERNANDEZ:  Judge, I know that the                  03:21

13    government has cited some case law regarding joint           03:21

14    tenants with the right of survivorship, and I do not have    03:21

15    any case law that disagrees with that -- with that case     03:21

16    law.                                                         03:22

17         However, I think it's very important for the           03:22

18    Court to consider the -- the equitable side of this case.   03:22

19    And in fact, Judge, I believe that it's clear that my       03:22

20    client as she made in her claim, that this was something    03:22

21    that she did get some advice.  It really wasn't with the    03:22

22    benefit of a real estate attorney; it was with the          03:22

23    benefit, I believe, of some conversations with a real       03:22

24    estate agent that it was important for her to put his       03:22

25    name, Mr. Dorman's name, on the property.                   03:22

1       It was money that was used -- that belonged                03:22

2   to her that was used -- that money, her money, is the          03:22

3   only money that was used to purchase the property.             03:22

4       She wanted it for him.  There may have been                03:22

5   other side issues, but the main thing was is that she          03:22

6   wanted it for him to have a house to live in.  I think         03:22

7   the Court is well aware of some of the mental issues that      03:22

8   he has, and that she wanted to be able to check up on          03:23

9   him.                                                           03:23

10      And I think it's very relevant that the                    03:23

11  property is only like a mile or so away from the property      03:23

12  where she was living.  Not only did she have that              03:23

13  security, but also the security that he would be               03:23

14  somewhere where she could periodically check up on him.        03:23

15      Certainly, there is no suggestion that she                 03:23

16  had any knowledge of any criminal activity that may have       03:23

17  been taking place in the home.  I would suggest, Judge,        03:23

18  this is simply calling it whatever legal label you want        03:23

19  to call it, it was simply purchased -- the property was        03:23

20  purchased to give her son a place to live near her so she      03:23

21  could check up on him.                                         03:23

22      Her son as stated, and I think the Court is                03:23

23  aware, has night seizures and fails to take care of his        03:23

24  affairs due to his mental disability.  She put her son on      03:23

25  the deed as a second party only for survivorship               03:23

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     purposes.  Maybe she didn't get the best legal advice at          03:23

2     that time from a real estate lawyer who was qualified to          03:24

3     maybe give her different advice.                                  03:24

4          But nevertheless I would ask the Court to                    03:24

5     consider the circumstances surrounding this and determine         03:24

6     that she is the true owner of the house, and she should           03:24

7     not have to lose it because Mr. Dorman was involved in            03:24

8     criminal activity.  That was not something she was a part         03:24

9     of or had knowledge of.                                           03:24

10         And, Judge, of course as I have stated, not                  03:24

11    only the money that was used to purchase the home, but           03:24

12    she's also paid for everything.  She's paid for the              03:24

13    taxes, the maintenance, the lawn maintenance, everything.        03:24

14         So financially, which is consistent with                    03:24

15    being a sole owner, the financial investment in it is            03:24

16    consistent with a single owner.                                  03:24

17         Thank you.                                                  03:24

18         THE COURT:  Miss Adams.                                     03:24

19         MS. ADAMS:  Your Honor, as the Court well                   03:24

20    knows, the only issue here today is whether or not Miss          03:25

21    Dorman has satisfied her burden of demonstrating that she        03:25

22    has an interest in the house, any interest.  It is               03:25

23    entirely her burden to demonstrate that.                         03:25

24         I have looked over the papers submitted by                  03:25

25    Miss Dorman.  I don't see any evidence that she has paid         03:25

1     for anything prior to the indictment of the defendant.     03:25

2              Although there appear to be some bills     03:25

3     received and possibly paid, though that's unclear, after     03:25

4     his indictment.     03:25

5              I think the cashier's check makes very clear     03:25

6     exactly where the money came from, from the defendant,     03:25

7     specifically to purchase the house after he received his     03:25

8     settlement.     03:25

9              And this mother who has, you know, done     03:25

10    various things to protect her son from himself, it     03:25

11    appears perhaps put it in her name, and at that point I     03:26

12    think the evidence suggests as a nominee or straw owner     03:26

13    to protect the house being taken should her son do     03:26

14    something foolish.     03:26

15             The United States had previously asked for     03:26

16    one-half interest in the house despite the fact that she     03:26

17    exercised no possession, dominion, or control over the     03:26

18    funds, and paid for nothing in terms of the purchase of     03:26

19    the funds [sic].     03:26

20             But the United States would defer to the     03:26

21    Court on whether Miss Dorman has presented evidence of     03:26

22    any actual legitimate ownership in the house, and     03:26

23    obviously defer to the Court on what interest was truly     03:26

24    the defendant's and now should be forfeited to the United     03:26

25    States.

But even if everything Miss Dorman said here was 100 percent factually accurate that, in fact, the money came from her -- was in no way directed by the defendant to be used for a house to be purchased for him, but it was her house to purchase a house for her that would only be his after she passed on, even if then if she had paid bills and done lawn maintenance, the defendant would have a half interest in the house.

The defendant has agreed to forfeit his interest in the house.  2253 and 853 both say the United States is entitled to forfeit his interest in the house. 853 goes on further to say once the United States is forfeited an interest in property, it's required to dispose of the property either by sale or by any other commercially feasible means that protects interests of third parties.

For that reason, the United States has requested that the Court forfeit the house to the United States and allow the United States to sell the house subject to whatever interest it is the Court decides Miss Dorman truly has in the house.  And to allow us to share the net equity, the net proceeds of the house with Miss Dorman, if necessary, after sale.

That disposition, I believe, adequately protects any interest of a third party, and is compelled

1    by 2253 and 853.  And if the Court has no questions,          03:28

2    that's all I have got.                                        03:28

3             THE COURT:  No, I don't have any questions.          03:28

4             MR. HERNANDEZ:  Could I briefly reply?               03:28

5             THE COURT:  Yeah.  Mr. Hernandez.                    03:28

6             MR. HERNANDEZ:  Judge, first of all, as far          03:28

7    as the pleadings in the case, I understand the case is        03:28

8    being litigated but the government has repeatedly             03:28

9    represented in their pleadings that their position has        03:28

10   always been that Miss Dorman has a half interest in the       03:28

11   property.                                                     03:28

12            I would add, Judge, that the argument that           03:28

13   the government is now making that the evidence suggests       03:28

14   that -- that, in fact, all of the money that was used to      03:28

15   purchase the house purely belonged to -- to Mr. Dorman, I     03:29

16   would suggest is pure speculation.                            03:29

17            That may be their twisted interpretation of          03:29

18   what was presented, but the only direct evidence that was     03:29

19   presented was the fact what Mrs. Dorman testified to that     03:29

20   that was her money, that that was money owed to her by        03:29

21   Mr. Dorman.  And there's been no evidence been presented      03:29

22   to show that that was an incorrect statement.                 03:29

23            THE COURT:  Okay.  I really think that the           03:29

24   place that I need to look is at the deed for the              03:29

25   property.                                                     03:29

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          And the deed as I have said earlier, I          03:29

2     think, which was executed or dated May the 16th, 2012,     03:29

3     the deed says the following:                               03:29

4          That it is to Iris Dorman, a married woman,           03:29

5     and Lawrence Dorman, a single man, as joint tenants with   03:29

6     right of survivorship.                                     03:30

7          That means he owns half of it and you own            03:30

8     half of it.  Now, there may be some equities on both       03:30

9     sides, but let me just tell you that your son received a   03:30

10    check of $278,000 on December the 28th, 2011.              03:30

11         And this warranty deed was executed on               03:30

12    May 16, 2012.  It was his money that purchased the         03:30

13    property.  He lived there.  He homesteaded it.             03:30

14         So as far as equities are concerned, other           03:30

15    than the fact that I'm sure you spent a lot of time and    03:30

16    effort with Mr. Dorman, and he has caused you lots of      03:30

17    heartache over the years, it would just be like my son or  03:30

18    daughter coming into $500,000, and I say to them, okay,    03:31

19    that $500,000 is mine because I spent a lot of time on     03:31

20    your schooling or I spent a lot of money on your clothes,  03:31

21    or I spent a lot of money sending you to college.          03:31

22         And that's just not how it works.  This may          03:31

23    seem unfair to you, but, frankly, the equities are not     03:31

24    even in your favor here.                                   03:31

25         It was his money.  He lived there.  He                03:31

1     homesteaded it.  All of those things.                        03:31

2            However, if I look at the deed, it does say          03:31

3     joint tenants with right of survivorship.  So that means    03:31

4     you have half interest, he has half interest.               03:31

5            So the government is asking that I -- they           03:31

6     request the Court to enter a final order of forfeiture,     03:31

7     which I will do, which vests title to the property in the   03:31

8     United States subject to the one-half interest in Iris      03:32

9     Dorman.                                                     03:32

10           And I'll direct the United States to dispose         03:32

11    of the property by selling the property and dividing the    03:32

12    proceeds equally with Miss Dorman.  If you will give me a   03:32

13    proposed order, I will sign it.                             03:32

14           MS. ADAMS:  Yes, Your Honor.                         03:32

15           MR. HERNANDEZ:  Judge, my client has two             03:32

16    questions.                                                  03:32

17           THE COURT:  Sure.                                    03:32

18           MR. HERNANDEZ:  She wants to know -- she's           03:32

19    got some stuff there at the house.  She would want to       03:32

20    know how long she would have to be able to remove --        03:32

21           THE COURT:  Stuff like --                           03:32

22           MR. HERNANDEZ:  I'm not sure.  Some                  03:32

23    furniture.                                                  03:32

24           THE COURT:  Oh, furniture.                           03:32

25           MR. HERNANDEZ:  That's question number one.          03:32

1    Although I don't think my client has the money, I know    03:32

2    that I had -- I would like to leave open the possibility    03:32

3    that she could buy the government out of that half.    03:32

4         But I don't know so rather than just it be    03:32

5    disposed of and sold quickly, I'd like to leave some time    03:33

6    for that to be explored.    03:33

7         THE COURT:  I don't have any objection to    03:33

8    that.  If you want to negotiate some sort of settlement,    03:33

9    that would be fine.  Why don't you talk to Miss Adams    03:33

10   about getting the furniture out.  I doubt she would have    03:33

11   an objection to that.    03:33

12        MR. HERNANDEZ:  Realistically, I don't think    03:33

13   my client has the funds to do it, but I wanted to leave    03:33

14   that possibility open.    03:33

15        THE COURT:  All right.  Thank you.    03:33

16   (Proceeding adjourned at 3:33 p.m.)    03:33

17        I CERTIFY that the foregoing is a true and

18   accurate transcription of my stenographic notes.

19   Dated:  09/11/2014.

20

21        ___s/ Sandra K. Provenzano_____
              SANDRA K. PROVENZANO, RPR
22            Official Court Reporter

23

24

25

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER